Case 13-1566 USA v. Thomas Wooten. Oral argument not to exceed 15 minutes per side. And Mr. Nunnery for the appellant. Good afternoon. May it please the court. My name is Jeffrey Nunnery. I'm here on behalf of the appellant Thomas Wooten. The issue presented by Mr. Wooten's appeal is whether or not the Miranda warnings administered to Mr. Wooten after his unwarned confession to the underlying offenses operated effectively as Miranda is intended to operate. Mr. Wooten submits that in this case the cat was already completely out of the bag before Miranda was ever even administered to him. The facts, I think, are important. The search warrant was executed at Mr. Wooten's residence. Officers arrived around 6 a.m. He was questioned as the house was being searched. There was a thumb drive found behind a dresser in his room that contained incriminating evidence. He was questioned about that, how he came to download the images of child pornography that were found on the thumb drive and also on a computer inside the residence. Let me just ask you, counsel, you're now presenting his side of the dispute, I gather. Yes. The FBI report doesn't indicate that he talked about how he downloaded and all of that until he got to the FBI office. Am I right about that? I believe there was discussion in the car at the scene when he was questioned about the contents of the disk. My recollection, anyway, from the suppression hearing transcript is that those are the facts, that he was questioned about the contents of the flash drive on the scene. Okay. So essentially the confession that Mr. Wooten gave at the station house post-Miranda essentially mirrors the confession that he gave to the officers without the benefits of Miranda at the scene of his arrest. Do you lose that argument if you're incorrect on your earlier rendition of the facts? I don't think so. I don't think so because he was questioned generally about the contents of the thumb drive and there was a more detailed statement given at the station house. If there were no questions regarding the thumb drive at the earlier unwarned interrogation, would that alter your argument? I don't think so because there was trace evidence found on the computer, and I'm sorry as far as the timing of the finding of the evidence on the computer, but I believe that there was an on-scene forensic tool kit. I'm not clear on that, but I don't think so. Even if I'm wrong on that, I don't think so because essentially if you just take that piece of information out of it, the statement at the scene and the statement at the station house are essentially the same. He's already confessed to the police. He admits to being in possession of child pornography. There really is no difference between the questioning at the station house versus the on-scene questioning according to the testimony induced at the suppression hearing, and that's what we're stuck with as far as the transcript, the evidence that was received in court. This court in Lopez set forth a five-part test under these circumstances to whether or not Miranda administered post-confession and a subsequent confession obtained. The Pacheco-Lopez case, I think, is right on point with this case. The five factors I've outlined in my brief, the factors and the evidence induced at the suppression hearing in support of those, the first factor is the completeness and detail involved in the first round of questioning. Again, there's very little that was substantively different post-Miranda. Well, let me just say that the Siebert, and I assume Siebert is basically where you're coming from on this. Siebert talks about a confession being made during the first discussion that's held between the officers and the defendant. It seems to me it strains it a little to say that what happened in the car was a confession, only to the extent that, I mean, again, I need to become more familiar with what the officers said during the suppression hearing. It was their testimony, I believe, that the district court gave credit to. Am I right about that? There was very little testimony given by the officers at the suppression hearing to counter Mr. Wooten's testimony, and I highlight that in my brief. When we talk about the factors, much of the testimony was unrebutted by the government. Well, that's not the point I'm trying to make. The point I'm trying to make is he had been asked about some things while he was in that car, and I gather unable to leave, and he answered their questions. And then the question that – there are two questions, really, that I'm concerned about. One is, is there any way to say that that was a confession in the same sense that what happened in Siebert was a confession? Number one. And number two, where is the evidence of deliberateness? Where is there any indication that the FBI set this up so that he would be – that his will to resist their interrogation later on would be overcome? There was no subterfuge on behalf of the agents. There wasn't a deliberate process like in Siebert. And it wasn't deliberate in Lopez either, this court's decision in Lopez. There were some questions asked, and it was, did it fall within the booking exception? Where did you come from in Lopez? Did you bring the cocaine with you? Nobody tried to subvert Mr. Lopez's rights, and I think that the facts in Lopez are much less egregious than the facts of this case. I think there were three questions asked. When did you get here? How did you get here? And where did you come from in Lopez? And did you have the contraband with you when you arrived? Yeah, okay. And then it stops, and then he's Mirandized. See, the problem is, here's the problem, and maybe we're inching over into the whole question of harmless error. They were going to prove pretty much that your client had possession of that pornography, even if they never talked to him at all. It was in the house. The other person in the house denied having any responsibility for it. It was the computer he was using, et cetera, et cetera, et cetera. That is sharply distinctive from the situation in Lopez where they needed to prove that he really had some connection with that contraband, and his confession was key there, not just cumulative evidence. But I don't know how easy a job the government would have had proving their case absent Mr. Wooten's confession. His confession to what, though, counsel? Downloading child pornography. I'm sorry? Downloading child pornography. Well, it was on his computer. Yeah, but it was on his computer. And you think he talked about that in the car? Or did he just say, yes, that's my e-mail address, and yes, that's my thumb drive? Okay, well, I'll recheck it. Yeah, and check me on that. I will. Thank you. I mean, my recollection is the statement in the car and the statement at the station house were really similar. There was more detail gone into at the station house about the mechanics of what he did. All right, let's talk a minute about the deliberateness. There's this rule that we're supposed to take out of a constitutional opinion by the Supreme Court, the most narrow rule that we can come of, which is Justice Kennedy. And if you're conceding that there was no deliberateness here, where does that leave us there? Well, when I read Lopez, it appeared to me as if this court didn't consider Justice Kennedy's concurring opinion and Siebert as controlling. There was discussion about how other courts have also grappled with whether it was the plurality opinion itself, the four that sided with Justice Kennedy, or if it's Justice Kennedy's rule. And I don't think that the circuits are even clear on whose test applies, which test applies, the plurality or Kennedy's. So you would say the Sixth Circuit has already decided that the plurality opinion applies. I think that that's what it comes down to. My reading of Lopez suggests that. And so, you know, you look at the facts of Lopez and you look at the facts of this case, there was much more evidence, information taken from Mr. Wooten on scene pre-Miranda, much more detail. And going to the elements of the offense, Lopez was just the four questions that we talked about. This was a lengthy discussion in the car, followed by an equally lengthy discussion at the station house. The cat's already out of the bag. And this court talked about in Lopez, what is the defendant to think once they've already given a full confession, and then all of a sudden they're presented with Miranda. This court suggests in Lopez that a defendant in that situation would be confused and wondering, why am I now hearing this? And there were no efforts made by the agents in this case, as in Lopez, to assure Mr. Wooten that anything that he said previously wasn't going to be used against him. It was essentially getting a full confession, going to the station house, Miranda Isingham, getting another one. There was enough information obtained in the first statement. Counsel, your red light's on, unless you want to take some of your rebuttal time. I probably should. I just want to indicate. How much time would you like to take from your rebuttal? I'll save three minutes for rebuttal. Okay, so that would be two minutes? I believe that would be two minutes. Can you put the green light on for two minutes, please? Okay. So the completeness of the detail involved in the first round of questioning, that's the first of the five-prong test of Lopez, it was a pretty detailed confession. Overlapping content, number two. Again, it was almost entirely overlapping. This timing and setting of the interrogation. One is at his residence. There's a brief 20-minute car drive from the residence to the station. The actors are the same. The officers are the same. The questioners are the same. So that goes to factor number four as well, the continuity of police personnel during the interrogations. And five, the last factor, there's not a lot of evidence in the record on this. I make mention of it in my brief. There really wasn't anything developed as far as how they treated the first round as continuous, or the second round as continuous to the first. Anyway, it's all briefed. It's in there. And I saw that the court requested a timeline. I'm glad they did. I think that this helps with the facts as far as how long it took to get to the station house from the scene and then what transpired. He was given coffee, an opportunity to use the bathroom, and they went right back into taking the statement from him. Thank you. Good afternoon. May it please the Court. Hala Jarbo on behalf of the United States. I think if you look at the facts and if you go back and look at the transcript from the suppression hearing, what counsel just indicated to you is quite different from what the record reflects. And if you look specifically, I know, Judge Doctor, you indicated you would go back and take a look at the record. The agents testified, and this is coming from the transcript at page IDs 280, 284, and 118, to, quote, introductory questions, including who was living at the house, who had computer access, who had laptops. Those were the same preliminary questions that they asked of the roommate. So when the agents arrived at the scene. But didn't they ask him to identify the photo of his daughter? Correct. So the initial information that's garnered initially is exactly that. It's who's living at the house, who has computer access. They ask him also to identify a picture of his daughter. That's the sum and substance. Does the record show where that picture came from? How did they get that picture? Was that something they seized during the execution of the warrant? No. Initially the investigation starts with two different investigations, one where there's an undercover agent that downloads photographs, another from an e-mail that comes from the same Internet protocol address from the home that sends out, and this e-mail sends out pictures that include 11 attachments, and one of those that they used was the picture of his daughter that they asked him to identify. And the bathtub picture? Correct. But where did the other one come from? Do we know that? The one where she's completely dressed. Correct. There are 11 attachments to that e-mail. Not all of them are child pornographic in nature. There were some where she was dressed, and there were some that specifically focused on her genital area. But they were all the same child in those 11 attachments. So initially when they appear at the home, the defendant's there as well as a roommate and the minor daughter of the roommate. And so they separate both adults. They keep the female roommate in the home because her daughter was sleeping and they didn't want to disturb that. They take Mr. Boone outside, put him in the back of a patrol car. Well, I'm sorry. Correct. Yes, correct. He was detained in the house. So he was in custody. Our argument at the district court level was that he wasn't, that he was being detained while they executed the search warrant. Your position was that he wasn't arrested. Correct. But what is your position on whether he was taken into custody? We don't contest Judge Battani's finding that he was in custody at that point. We're not contesting that. My argument specifically, though, in terms of what counsel indicated, if you look at Well, let me just stop you just a minute. You know, preliminary matters are fine. Is this your house? How long have you lived here? How many, is this, do you have a computer that you're using? So far we haven't gotten to anything incriminating, really. But then when you pop up with a picture you've gotten off the Internet and say, is this your daughter? And he says, yes, it is. And it's somehow been attached to his, something that apparently comes from his address. And now you're, in my judgment at least, getting pretty close to the line of, if not over the line, of getting what amounts to inculpatory statements from him. I guess what I'm concerned about is most of the FBI agents I've known or heard about have been highly trained. I mean, other than a deliberate effort to do what the defendant says they did, what was the excuse for not giving him a Miranda warning immediately? Well, initially at the scene, as I indicated, he was just being detained. Now when they arrive at the scene, all they know is that an Internet protocol address, which is basically where you're getting Internet from that home, from that address there have been pictures sent that are of a child pornographic nature. They don't know who has sent them. It could be anyone in the home. It could be a visitor that's at the home. So it's not quite that inculpatory in the sense that they know, just IDing or just identifying the individual doesn't mean, and they didn't get that information, all he did was identify her. He didn't say, I was the one that sent it at the scene. Okay. But it is my daughter is what he said. Correct. Correct. And that was part of what they were trying to figure out as well, was to identify that individual. And what's important to note, counsel indicates that there were all these things that were not rebutted by the government at the suppression hearing. When this motion was originally filed, it was a motion to suppress based on a coercion argument. And so we had a full hearing, and it was at the end of that hearing that trial counsel indicated, well, Judge, there's, I think, another issue that I want to address and that I want to brief for the court, and that is this Miranda in the middle issue. And so then after the hearing, we had already briefed the initial issue. After the hearing, the court asked for additional supplemental briefing. And so to say that it was unrebutted, I think, distorts the facts. And I think there was obviously sufficient facts in the record that allowed the district court to make a finding. And specifically in terms of the findings that the district court made, as to some of your questions, she did find that there was no deliberate action by the agents, that there was no coercion affiliated with either the first statement or the second. Do you have a, I'm sorry, would you point me in the opinion where she didn't make a decision, where she made a decision on deliberateness? Yes. Rather understood that she didn't make a finding on deliberateness. Okay. She did say in terms of the taint, that the taint doesn't carry over to the second statement, that there was no taint, and that was found at page, from the record, record 33, page 344. She indicates that she declines to characterize the two statements as one continuous statement, that he made one statement at the scene and one statement at the FBI office, that these were not Miranda warnings given in the middle. She indicates that the Miranda warnings delivered at the Macomb County RA accomplished their objective. The court finds no taint carries over to the subsequent statement. Notably, there was no coercion affiliated with the first statement, and that's all on page 344. And do you classify that as an actual finding on deliberateness of warning in the middle? It seems to me to lack that determination. Maybe it's my argument. My argument is that based on everything in terms of what she did find, I don't think you can find anything in the record that does indicate that there was any deliberate action. In fact, she specifically found that as it relates to the first statement, and at that point the first statement is not in the back of a patrol car, it's in the back of the FBI agent's car, that there was no coercion with either, and that even if there was, she indicated that there was no taint, obviously, that would carry over. I guess the problem for me is we're talking about standard, and you can deliberately plan to interrogate Miranda afterwards, reconfirm what you found out, without coercion, just because you deliberately intended to do that. And I would submit to you and to the court that these agents didn't do that, and the facts support that. Did not? Did not. And if you look at the scenario at the scene, the very short scenario where they're asking these preliminary questions, and then the scenario later at the FBI offices, they are very different. So if you look at the Seabird analysis and that fifth factor of how did the interrogators treat the first statement and the second statement, the first statement is in the back of the patrol car, the same preliminary questions that they asked originally of the roommate. The second statement, after he's been arrested, on an unrelated state warrant, they take him to the FBI office where he's allowed to use the restroom. He does, I think, twice. He's offered food, coffee. He's given coffee two times. He's given Miranda instructions. He goes through and actually reads and waives all those, signs off on that. He sits down for, in the totality of the interview, was it about an hour and 20, I'm sorry, an hour and 20, no, actually an hour and a half, where he gave a detailed confession, where he gave specifics about different things, producing child pornography, distributing, possessing, all of those things where he actually wrote out a written, or I'm sorry, the agents wrote out a statement that he reviewed, that he initialed every single paragraph, all of that for an hour and a half, completely different from the preliminary questions for a few minutes in the back of a police vehicle. So I think if you were to make that analysis and go through the factors, even the factors as they list out and compare that with the facts, that the agents did treat that differently. He wasn't, in their minds, under arrest at the scene. Well, I do think a reasonable person who's in the back of a patrol car or an FBI car, who's wearing handcuffs, I mean, I would find handcuffs very intimidating, frankly. I mean, to say that there was no coercion involved in that is, I think, skating on some thin ice. I mean, there's no way he could have thought he was free to go. I assume those doors were locked so that he couldn't get out. And he's handcuffed. Did they take the handcuffs off him before they talked to him in the FBI vehicle? In the vehicle at the scene? Yeah. I don't know that there's any testimony that answers that question. But he is in the back of a car. In terms of when they go out to execute a search warrant, it's pretty routine, obviously, to detain someone, and for their safety, maybe to handcuff them. But that doesn't necessarily mean for their safety. For their safety or for, you know, I mean, initially, when he's in the back of a patrol car, I would submit to the court that I think that's probably locked. And I think in the back of the agent's car, that was not locked. Well, it may not have been locked because now they've got two of them with him. He's not going anywhere, though. Correct. Correct. Okay. One other thing that I wanted to touch on that counsel talked about was this thumb drive. There was absolutely no testimony that indicated that the agents knew that that thumb drive was there when they were at the scene. In fact, both agents testified that they didn't find that out until, as they questioned him, in terms of his confession that he made at the FBI offices. And I believe that the record indicates that they then called, because they're at the FBI offices, and called the agents that are still left at the scene executing the search warrant and told them, based on what the defendant told them, where it was hidden, behind a dresser, on the floor, in a particular bedroom. And the district court did credit the agent's testimony on that and indicated that she believed the agent's testimony and not the defendant's testimony at the hearing, that he indicated this was a thumb drive that he told them about right at the beginning. In fact, he didn't make any sort of confessions, really, at the scene. He tells them about an email. He identifies an email address and computer access and identifies his daughter. Compared to what he tells them later on at the FBI offices, in terms of everything from a thumb drive that contains hundreds, if not thousands, of images of child pornography that he downloaded from the Internet, that he stored on this thumb drive that he had hidden, including taking pictures of his own daughter that he then sent out over the Internet in the hopes of trading and receiving other images for himself. So he admits to the production, the distribution, the receipt, the possession of child pornography, all of these things, none of which he admitted to at the scene. He also tells them about the thumb drive and tells them where it is. He gives, as the court found, or as the lower court found, these were two separate and distinct statements, one at the scene and one at the FBI offices. Weren't there more discussions at the initial interrogation regarding the mother of his child and his relationship with the mother of his child? Yes, I believe there were, yes. So now we're getting, you know, you're not just asking do you live here, do you have an address, do you have access to the Internet? Now it's, oh, do you have a child, and tell me about the child's mother, oh, you're fighting with her, oh, you got custody. This is a pretty extensive tell us about your personal life, all of which relates to the child who was the subject of the photographs, doesn't it? And isn't that what they were following up on? How frequently do you see this child? Oh, you have court-ordered visitation. How do those not really, particularly in light of the 20-minute time delay, how does that not make it continuous? Well, I think that, first of all, those questions in and of themselves are not a confession. If they're questions about who has custody of the child, where is this child, and what about the mother, and those kinds of things, and certainly none of those things contributed to any of the confession that was obtained later on. I don't think questioning him regarding those things really relate to, ultimately, who was producing child pornography, who was distributing it, all the things that related to the eventual charges. So they might have been somewhat relevant in terms of the child and maybe identifying the child, but were they a full confession? Did they lead to the ultimate, the latter confession that the court determined to be separate and distinct? I would submit that it didn't. So here's the question, then. Why didn't, at some point while all this was going on, why didn't the government raise the possibility of harmless error? Your Honor, I think we submitted our reply basically based on we don't feel that the argument that the defendant makes is fulfilled here, and based on the record and based on... I mean, what are we supposed to do about the fact that you didn't raise it? Well, Your Honor, I think if you look at the totality of the record... There isn't any error. You're standing there on that point, I gather. Your Honor, we'll rely on our briefings, but yes. And I thank the court for pointing that out. All right, thank you. Thank you. Thank you. Any rebuttal? Very brief. Judge Daughtry, I think you hit the nail right on the head as far as the question about coercion. In handcuffs, in the back of a car, two-way, you're not going anywhere. You're in custody. And how would a reasonable person feel? Well, so he was in custody at that point, and so the judge did say, well, as to those statements, they're suppressed. They're inadmissible. Right. Okay. Again, the cat was out of the bag. I want to point the court to the part of the record upon which I relied in my argument, since that has become an issue. It's record item number 32, page IDs number 154 through 335, and page ID 202, lines 17 through 20. That is Mr. Wooten's statement about what happened at the scene where he was taken into custody and at the station house. Of course, the statement at the station house takes a lot longer to get. There's two agents involved. Questions are being asked. Clarifications are being made, and it's being written down. They're being very careful and meticulous to make sure that they include all of the information that they can get from Mr. Wooten into the statement. So they've already got a preview of everything at the scene, and that preview sets the stage for what they're going to go after when they get to the station house. And we're not arguing that the agents were deliberate in trying to subterfuge Miranda. We're not making that argument. It was a mistake. But the question is, once the mistake was discovered, did the administration of the Miranda warnings operate effectively to protect the safeguards? And under the facts of this case, we submit that it does not. The first statement was merely a prelude to the second. The cap's out of the bag. All of the information that he gave in the first statement was incorporated into the second statement, and a lot more detail was gone into it, granted. But if you look at Lopez, and you look at the questions that were asked of Mr. Lopez, and you look at the questions that were asked of Mr. Wooten,  four questions of Lopez, Miranda, and then a full confession after. But then he stops talking. I'm sorry. So they used the pre-Miranda statements. This court says, no, those four questions cross the line. You can't do it. And we submit that the questionings in this case cross that line as well. Thank you. The case shall be submitted, and the clerk may call the next case.